dissenting:
Under the federal Clean Air Act, States control air pollution within their borders by adopting State Implementation Plans, known as SIPs. When EPA issues new national air pollution regulations, States are required to update their SIPs accordingly. If a State does not update its SIP in a timely manner, EPA may impose a Federal Implementation Plan, or FIP, for that State.
In this case, EPA issued new regulations governing emissions of greenhouse gases. EPA’s action required that States in turn revise the portions of their SIPs incorporating the Prevention of Significant Deterioration (PSD) program, which requires construction permits for large construction projects. EPA set short deadlines for States to update their SIPs. Texas and Wyoming did not meet their deadlines, and EPA imposed FIPs for Texas and Wyoming. Texas, Wyoming, and Industry Petitioners[1] challenge EPA’s action.
As a starting point, the parties here all agree that the States must revise their SIPs to incorporate greenhouse gas regulations. Texas, Wyoming, and Industry *200 Petitioners argue, however, that an EPA regulation expressly gives States up to three years to revise their SIPs. Moreover, Texas and Wyoming assert that, during those three years, they have authority to issue valid PSD construction permits under their old SIPs, which do not consider a source’s greenhouse gas emissions.
In my view, this case is straightforward. The relevant EPA regulation plainly gives States three years to revise their SIPs whenever new pollutants, like greenhouse gases, are regulated under EPA’s PSD regulations. See 40 C.F.R. § 51.166(a)(6)(i). During that time, States may still issue PSD construction permits.
EPA also relied on an alternative ground in imposing a FIP on Texas before Texas’s 12-month deadline for revisions had even passed. EPA retroactively disapproved Texas’s pre-existing SIP because, according to EPA, the SIP was flawed when EPA approved it 18 years earlier. EPA claims that Texas’s SIP was flawed because the SIP neither (i) updates automatically to incorporate new federal regulations, such as the greenhouse gas regulations, nor (ii) provides express assurances that the State will update its plan as necessary whenever a new EPA regulation issues. But neither the Act nor EPA regulations require either an automatically updating SIP or assurances that the State will reflexively update its plan. So Texas’s SIP was not flawed when EPA approved it 18 years earlier, and it cannot be retroactively disapproved on that basis.
For those reasons, I would vacate the relevant EPA orders.
I
An EPA regulation, 40 C.F.R. § 51.166(a)(6)(i), resolves this case. That regulation gives a State without an automatically updating SIP (that is, without a SIP that automatically incorporates new EPA regulations) three years to revise its SIP when EPA changes the PSD requirements.
The regulation states quite plainly: “Any State required to revise its implementation plan by reason of an amendment to this section [with certain specified exceptions] shall adopt and submit such plan revision to the Administrator for approval no later than 3 years after such amendment is published in the Federal Register.” 40 C.F.R. § 51.166(a)(6)(i). In various forms, this regulation has been in place since 1980, with the relevant time period increased in 2002 from nine months to three years. See 67 Fed.Reg. 80,186, 80,241 (Dec. 31, 2002); 45 Fed.Reg. 52,676, 52,687 (Aug. 7, 1980). Under the regulation, States with SIPs that do not automatically incorporate newly covered pollutants — for example, Wyoming and Texas— have three years to submit new SIPs when EPA changes the relevant air pollution regulations. In the interim, those States are able to issue construction permits under their old SIPs.
Here, however, Texas and Wyoming were not given three years to revise their SIPs. And EPA did not allow States to issue valid construction permits under their old SIPs. Put simply, EPA did not follow its own regulation. EPA could of course withdraw or amend the regulation setting forth the three-year revision deadline, but it has not done so. Therefore, the regulation applies. See, e.g., Transactive Corp. v. United States, 91 F.3d 232, 238 (D.C.Cir.1996) (agency cannot “ignore its own regulation”); Panhandle Eastern Pipe Line Co. v. FERC, 613 F.2d 1120, 1135 (D.C.Cir.1979) (“It has become axiomatic that an agency is bound by its own regulations. The fact that a regulation as written does not provide [the agency with] *201 a quick way to reach a desired result does not authorize it to ignore the regulation or label it ‘inappropriate.’ ”) (footnote omitted).
EPA has offered three explanations for why the regulation does not bar its actions here. In my view, none suffices to overcome the plain language of Section 51.166(a)(6)(i).
First, EPA has said that the changes States had to make to their SIPs in this case were not “by reason of’ changes to EPA’s PSD regulations, as the language of Section 51.166(a)(6)(i) demands to trigger the three-year revision period. I disagree.
EPA changed its PSD regulations to encompass greenhouse gases. By reason of that change, States’ SIPs must be revised. So by its terms, Section 51.166(a)(6)(i) applies. To be sure, EPA changed its PSD regulations in part because the statute required EPA to alter its PSD regulations once greenhouse gases were considered a covered pollutant. That is because the statute itself requires the PSD program to cover any pollutant subject to regulation under the Act. See Coalition for Responsible Regulation, Inc. v. EPA, 684 F.3d 102, 143 (D.C.Cir.2012).
But regardless of whether EPA changes its PSD regulations as a matter of statutory discretion or as a matter of statutory dictate, the resulting SIP revisions are required “by reason of an amendment to” the PSD regulations. Where the change to the PSD regulations is a matter of statutory dictate, the causal chain may begin with the statute, which in turn requires EPA to change the PSD regulations, which in turn requires changes to the SIP. But the changes to the PSD regulations still ultimately are what require the changes to the SIP. I think it’s plainly incorrect to say — as EPA does and the majority opinion accepts — that Section 51.166(a)(6)(i) and its “by reason of’ requirement apply when EPA makes a discretionary change to the PSD regulations but does not apply when EPA makes a statutorily mandated change to the PSD regulations. See Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). EPA’s position is a bit like saying that a car accident victim wasn’t injured by reason of the other driver’s negligence but rather by reason of the car’s poor design when, in fact, the victim was injured by reason of both causes. So too here.
Moreover, the language in the preamble to EPA’s 2002 amendment to Section 51.166(a)(6)(i), which changed the relevant time for a State to update its SIP from nine months to three years, says simply that Section 51.166(a)(6)(i) applies whenever EPA “revisefs]” the PSD regulations. 67 Fed.Reg. at 80,241. In other words, in 2002 when EPA explained this regulation, EPA itself did not think the “by reason of’ language somehow drew a distinction between (i) cases involving discretionary changes to the PSD regulations and (ii) cases involving statutorily mandated changes to the PSD regulations. Instead, EPA said that Section 51.166(a)(6)(i) applies whenever EPA revises the PSD regulations.
In addition, if EPA were right here, then the three-year time period in Section 51.166(a)(6)(i) for a State to update its SIP should not have applied when EPA changed or revised the National Ambient Air Quality Standards in the past. After all, in those cases, once EPA decided to revise the NAAQS, the required SIP changes were statutorily mandated, not just a matter of EPA discretion. Yet tellingly, in those cases EPA actually cited and applied Section 51.166(a)(6)(i) and gave States the required time to comply, as set forth in the regulation. See, e.g., 73 Fed.Reg. 28,321, 28,341 (May 16, 2008) (applying Section 51.166(a)(6)© when the *202 PM2.5 NAAQS were updated); 52 Fed. Reg. 24,672, 24,682 (July 1,1987) (applying Section 51.166(a)(6)(i) when the PM10 NAAQS were instituted). So EPA’s interpretation of the regulation here not only is contrary to the regulation’s plain terms and EPA’s own prior descriptions, but also is flatly inconsistent with how EPA has previously applied the regulation.
Second, EPA suggests that, regardless of how much time a State takes to revise its SIP, the regulation contemplates a construction moratorium in the period until the State revises its SIP. That is, the State cannot issue valid permits under its existing SIP in the interim. This is a very weak argument.
Most importantly, the regulation by its terms does not impose a construction moratorium during the period in which a State without an automatically updating SIP is revising its SIP. And it would be borderline nonsensical for the agency to give a State three years to revise its SIP to meet new PSD requirements — as EPA’s regulation expressly does — only then to simultaneously tell the State that permits must meet the new PSD requirements during those three years. A State that took advantage of the three-year period would do so at the expense of bringing major construction in the State to a grinding halt. As I see it, it does not make any sense to read the regulation to silently impose such a ridiculous regime.
Moreover, in the past, EPA has not barred States from issuing permits during this interim period. EPA has traditionally allowed States without automatically updating SIPs to issue permits under their existing SIPs during the interim period. See, e.g., 60 Fed.Reg. 55,792, 55,794 (Nov. 3, 1995) (“[T]he implementation date for States with SIP-approved PSD permitting programs ... will be the date on which EPA approves each revised State PSD program containing the PM-10 increments. In accordance with 40 CFR 51.166(a)(6)(i), each State with SIP-approved PSD programs was required to adopt the PM-10 increment requirements within nine months [the period of time the regulation then required] of the effective date.... ”); 52 Fed.Reg. at 24,682 (“States with approved PSD SIP’s will have 9 months” — the period of time the regulation then required — “from the effective date of today’s PSD amendments to revise their SIP’s for PM10 and submit them to EPA for approval. See revised section 51.166(a)(6) [formerly section 51.24(a)(6) ]. In the meantime, the EPA expects these States to continue implementing their existing programs for particulate matter.”) (emphasis added).
In the past, in other words, EPA has recognized and adhered to the plain language of Section 51.166(a)(6)(i). But here, EPA has basically re-interpreted the regulation to be meaningless. As a matter of basic administrative law, we cannot countenance the agency’s blatant disregard of the text of its own regulations. See Auer, 519 U.S. at 461, 117 S.Ct. 905; Panhandle Eastern Pipe Line Co., 613 F.2d at 1135 (agency does not have “authority to play fast and loose with its own regulations”).
Third, in its brief and at oral argument, EPA’s counsel ultimately asserted that the regulation cannot trump the statute, and EPA’s counsel actually suggested that EPA’s own regulation was invalid. But the regulation remains binding law, and States and Industry have not challenged it in this case — rather, they have invoked and relied on it. In this posture, EPA cannot disclaim the validity of its own regulation. If EPA thinks its own regulation violates the statute, it can of course endeavor to amend or withdraw it. Until then, however, States are entitled to rely on it, and EPA must follow it.
*203 In any event, EPA’s regulation is not invalid under the statute. Although I think the statute gives EPA discretion to amend the regulation so as to shorten the lag time for States to revise their SIPs, the statute certainly does not forbid this current regulation. In one form or another, the regulation has been on the books and applied by EPA for some 30 plus years. And the regulation represents an entirely sensible and reasonable reading of the statute.
EPA’s counsel contended, however, that Section 165 of the Clean Air Act unambiguously triggers a construction moratorium in States like Wyoming and Texas whenever new pollutants are regulated under the Act, because Section 165 applies directly to sources and immediately prohibits construction of sources without up-to-date permits. Section 165, as relevant, states: “No major emitting facility on which construction is commenced after August 7, 1977, may be constructed in any area to which this part applies unless,” among other things, “a permit has been issued for such proposed facility in accordance with this part” and “the proposed facility is subject to the best available control technology for each pollutant subject to regulation under this chapter.” 42 U.S.C. § 7475. But Section 165 applies only through the relevant SIP, not directly to sources. See id. § 7471 (“each applicable implementation plan shall contain emission limitations and such other measures as may be necessary, as determined under regulations promulgated under this part, to prevent significant deterioration of air quality in each region”); EME Homer City Generation, L.P. v. EPA 696 F.3d 7, 28 (D.C.Cir.2012) (Clean Air Act “reserves the first-implementer role for the States”). It would make no sense for the Clean Air Act to set out a role for the States in implementing the PSD program in the first instance but then bypass the States when the PSD program is amended. To be sure, because of Section 165, States are required to change their SIPs when EPA changes the PSD requirements. But the statute does not tell us how quickly States must do so or what happens in the interim. For some 30 years, EPA’s regulation has filled that statutory gap. It is at least reasonable to read the statutory language — as EPA has done for those 30 years — to allow a facility to begin construction if a permit has been issued in accordance with the existing SIP while the State goes about revising that SIP within a time reasonably set by EPA.
The regulation, then, represents a reasonable way to fill a statutory gap and structure the transition process when EPA has adopted new PSD regulations that require changes to SIPs. Therefore, I would not accept EPA’s drive-by effort to neuter the regulation here instead of going through the requisite legal process for amending or repealing it.
In this case, EPA in effect has required all States — including those without automatically updating SIPs, such as Texas and Wyoming — to immediately update their PSD permitting process when PSD requirements are changed. That approach cannot be squared with EPA’s regulation. Section 51.166(a)(6)(i) expressly allows the States without automatically updating SIPs three years to update the PSD programs in their SIPs when PSD requirements are changed. That regulation has been on the books and followed by EPA for some 30 years. EPA may now believe that the regulation is bad policy. If so, EPA should change the regulation. But until then, the regulation remains binding law.
In light of the regulation, I would therefore vacate the relevant EPA orders in this case.
*204 II
EPA also relied on alternative grounds for imposing a Federal Implementation Plan on Texas. EPA retroactively disapproved Texas’s SIP 18 years after the SIP was promulgated, allegedly because the SIP was flawed when EPA first approved it. In my view, EPA’s alternative ground for imposing a FIP on Texas is likewise flawed.
EPA disapproved Texas’s SIP under the “error correction” provision of the Clean Air Act, Section 110(k)(6). Section 110(k)(6) provides: “Whenever the Administrator determines that the Administrator’s action approving, disapproving, or promulgating any plan or plan revision (or part thereof) ... was in error, the Administrator may ... revise such action as appropriate without requiring any further submission from the State.” 42 U.S.C. § 7410(k)(6). Both Texas and EPA agree that the error correction provision allows EPA to revise its action approving or disapproving a SIP only when that action “was in error.” That is, Section 110(k)(6) can be used to retroactively disapprove a SIP only if the SIP was out of compliance with the Act or EPA regulations when the SIP was originally approved.
EPA claims that Texas’s SIP was flawed when it was originally approved because the SIP neither (i) updates automatically to incorporate new federal regulations, like the greenhouse gas regulations, nor (ii) provides assurances that the State will update its plan as necessary whenever a new EPA regulation issues. See 76 Fed.Reg. 25,178, 25,179 (May 3, 2011); 75 Fed.Reg. 82,430, 82,431 (Dec. 30, 2010). EPA therefore issued a FIP for Texas.
The problem with EPA’s analysis is that nothing in the Clean Air Act or in EPA’s regulations requires that SIPs automatically update or that States provide express assurances that they will revise their plans every time EPA issues a new regulation. To begin with, EPA admits both in its briefs and in its regulations that SIPs are not required to be automatically updating. EPA Br. 55; 76 Fed.Reg. at 25,198. So the fact that Texas’s SIP does not automatically incorporate new federal regulations is a red herring. In addition, nothing in the PSD permitting regulations or in the statute requires a State to “address, or provide assurances of the requisite legal authority concerning, the application of PSD to all pollutants newly subject to regulation.” 75 Fed.Reg. at 82,433. And EPA cannot disapprove a SIP based on a non-existent requirement. To be sure, the Clean Air Act requires States to provide “assurances that the State ... will have adequate personnel, funding, and authority under State (and, as appropriate, local) law to carry out such implementation plan.” 42 U.S.C. § 7410(a)(2)(E). But providing “assurances that the State” has “authority” to “carry out such implementation plan” just means that the State must be capable of administering the SIP it submits to EPA. That language does not require a State to assure EPA in advance that the State has “authority” to revise its plan every time a new pollutant is regulated. So Texas’s 1992 SIP was not flawed when EPA originally approved it.
Because Texas’s SIP was valid when approved, EPA’s action in approving it back in 1992 was not “in error.” So EPA was not authorized to disapprove it now under Section 110(k)(6).
In sum, EPA did not have authority to disapprove Texas’s and Wyoming’s SIPs or to issue FIPs to regulate emissions of greenhouse gases in those States until the expiration of the three-year period set forth in EPA’s regulation. Under that binding EPA regulation, States without *205 automatically updating SIPs are entitled to three years to revise their SIPs to cover greenhouse gases. During that time, States have legal authority to issue valid permits under their existing SIPs. EPA’s orders should therefore be vacated.
For those reasons, I respectfully dissent.

. Industry Petitioners include Utility Air Regulatory Group, National Mining Association, Peabody Energy Company, SIP/FIP Advocacy Group, Coalition for Responsible Regulation, Inc., Industrial Minerals Association — North America, National Cattlemen’s Beef Association, Great Northern Project Development, L.P., Rosebud Mining Company, Alpha Natural Resources, Inc., Chase Power Development, LLC, Texas Chemical Council, Texas Association of Business, and Texas Association of Manufacturers.